IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| KAREN THOMSON, | ) | |
| | ) | |
| Plaintiff, | ) | CV-03-1350-ST |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| MENTOR GRAPHICS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Karen Thomson ("Thomson"), is an attorney who worked for defendant,

Mentor Graphics Corporation ("Mentor Graphics"), from 1984 until 2003.  On May 15, 2003,

Thomson requested medical leave from her job for stress and resigned on July 7, 2003.  On

October 1, 2003, she filed this action alleging that Mentor Graphics discriminated against her on

the basis of her age, paid her less than her male predecessor, wrongfully constructively

terminated her, and defamed her.  Thomson's Second Amended Complaint alleges four claims

against Mentor Graphics for: (1) violation of the Age Discrimination in Employment Act

1 - FINDINGS AND RECOMMENDATION

("ADEA") and ORS Chapter 659A (First Claim); (2) violation of the Equal Pay Act ("EPA")
and ORS Chapter 652; (3) wrongful discharge; and (4) defamation.

Mentor Graphics has now filed a Motion for Summary Judgment (docket #43) against
each of Thomson's claims.  This court has original jurisdiction over the federal statutory claims
under 28 USC § 1331 and supplemental jurisdiction over the state law claims under 28 USC
§ 1367.  For the reasons that follow, Mentor Graphics' Motion for Summary Judgment (docket
#43) should be granted.

## STANDARDS

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any
material fact and the moving party is entitled to judgment as a matter of law.  The moving party
must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323
(1986).  Once the moving party shows the absence of an issue of material fact, the non-moving
party must go beyond the pleadings and designate specific facts showing a genuine issue for
trial.  *Id* at 324.  A scintilla of evidence, or evidence that is merely colorable or not significantly
probative, does not present a genuine issue of material fact.  *United Steelworkers of Am. v.
Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989).

The substantive law governing a claim or defense determines whether a fact is material.
*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The
court must view the inferences drawn from the facts in the light most favorable to the non-
moving party.  Thus, reasonable doubts about the existence of a factual issue should be resolved
against the moving party.  *Id* at 630-31.  However, when the non-moving party's claims are
factually implausible, that party must come forward with more persuasive evidence than would

otherwise be required.  *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.*,

818 F2d 1466, 1468 (9th Cir 1987), *cert denied*, 484 US 1006 (1988), citing *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 US 574 (1986).  The Ninth Circuit has stated, "No longer

can it be argued that any disagreement about a material issue of fact precludes the use of

summary judgment."  *Id.*

## DISCUSSION

## I.  Facts

In an apparent effort to both test the patience of this court and test the limits of Local

Rule 56.1, the parties to this controversy have submitted a flurry of documents, totaling 104

pages,[1] outlining their positions on, objecting, responding, replying to, and moving to strike the

other side's submissions regarding the facts of this case.

No useful purpose would be served by this court sorting out every nuance in those factual

submissions.  Because all material facts must be viewed in the light most favorable to the

///

///

---

[1] The titles of these documents alone are mind-numbing.  They include: Defendant's Concise Statement of Material Facts (docket #45) (5 pages plus 1 page summary of job duties unique to Thomson and Mr. Tyron); Plaintiff's Response and Concise Statement of Material Facts in Opposition to Defendant's Amended Concise Statement of Material Facts in Support of Defendant's Motion for Summary Judgment (docket #57) (15 pages plus 3 page summary of performance reviews spanning 1993-2003); Defendant's Response to Plaintiff's Additional Statement of Material Facts (docket #62) (33 pages replying to additional facts offered in docket #57); Defendant's Reply to Plaintiff's Response and Concise Statement of Material Facts in Opposition to Defendant's Amended Concise Statement of Material Facts in Support of Defendant's Motion for Summary Judgment (docket #64) (6 pages replying to opposition articulated in docket #57); Plaintiff's Motion to Strike and Objections to Evidence and Concise Statement of Material Facts Offered by Defendant in Support of Defendant's Motion for Summary Judgment (docket #60) (1 page motion and 10 page chart outlining evidence and objections thereto); and Defendant's Response to Plaintiff's Motion to Strike and Objections to Evidence and Concise Statement of Material Facts Offered by Defendant in Support of Defendant's Motion for Summary Judgment (docket #63) (30 page response, detailing plaintiff's objection, and quoting countering deposition excerpts).

non-movant, this court will view the evidence in the light most favorable to Thomson and will

highlight only those facts necessary to decide the pending motion.[2]

Thomson, who was born April 12, 1950, is a former female employee of Mentor

Graphics.  Thomson received a J.D. from Northwestern School of Law, Lewis and Clark

College, in June 1982.  She was admitted into the Oregon State Bar in September 1982 and was

in private practice in Portland, Oregon, for approximately two years before she was hired by

Mentor Graphics.  Mentor Graphics hired Thomson in February 1984 as a "Contracts

Administrator" in the Administration (Legal) Department.

Approximately three months later, Mentor Graphics hired Chuck Tryon ("Tryon"), who

had a Bachelor's and a Master's degree in English and six years of contracts administration

experience, but who was not an attorney, as a "Contracts Administrator."  For some period of

time, both Thomson and Tryon negotiated customer agreements and reported to the same

manager, Grethe Larson ("Larson").  By the late 1980's, Larson changed their titles to

"Contracts Manager."  In late 1994 or 1995, Tryon was promoted to the position of "Director of

Worldwide Contracts."  Thompson Dec, ¶ 4.  As Director of Worldwide Contracts, Tryon spent

about 20 hours per week managing the worldwide contracts staff.[3]  The remainder of his time

was spent on third-party negotiations and other non-management duties, including working on

technology

---

[2]  Excerpts from affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration, or page(s) of the deposition transcript.

[3]  The contract management functions consumed significantly greater portions of Tryon's time near the end of each quarter, as it is not unusual for Mentor Graphics to bring in close to a third of its quarterly revenue on the last day of the quarter. Freed Depo, pp. 146-49.  Consequently, at the end of the quarter, "[Tryon's] contract management duties would overwhelm everything else that he did."  *Id* at 149.

///

licensing deals and distribution agreements, and spinning off at least one of Mentor Graphics'

distributors into an independent sales organization.

In late 1989, Larson changed Thomson's title to "Corporate Attorney I."  In 1991, Dean

Freed ("Freed"), Mentor Graphics' Deputy General Counsel, began supervising Thomson.  Freed

consistently gave favorable reviews to Thomson and promoted her in 1993 (to Corporate

Attorney II), 1997 (to Corporate Attorney III), and in early 1999 (to Senior Counsel).  The only

persons Thomson supervised in these positions were the individuals assigned to assist her with

administrative tasks.

In early 2001, Tryon left the position as Director of Worldwide Contracts.  Another

Mentor Graphics employee, Ambyr O'Donnell, took over some of the duties Tryon had been

performing, particularly in the third party licensing area.  Freed Depo, pp. 151-52.  Freed took

over some of the distributorship and third party licensing work.  *Id* at 154.  Depending on their

respective work loads, other Mentor Graphics employees took on projects that normally would

have fallen to the Director of Worldwide Contracts.  *Id*; Lawson Depo, p. 29.

Freed asked two women to take on Tryon's contract management duties; each refused.

Freed then asked Thomson to take over those duties.  Thomson accepted, and began performing

those duties in addition to the duties she already had as Senior Counsel.[4]  Her title became

"Senior Counsel and Worldwide Contracts Manager."

---

[4]  At least one document indicates that Thomson was instructed to delegate some of her "ministerial work" in leasing and real estate matters to the facilities group or outside counsel.  Thomson Depo Ex 2 at MG000212.

5 - FINDINGS AND RECOMMENDATION

Some time before October 2001, Thomson raised the issue that her pay was less than Tryon's pay had been. Thomson Dec, ¶ 12. Freed's response was that he would "take care of it" at the next potential midpoint adjustment time. *Id*. Freed raised Thomson's FTE status from 0.8 to 0.85 in October 2001; from 0.85 to 0.9 in November 2001; and from 0.9 to 0.95 in December 2002. Thomson Depo, pp. 89-92. During that time, there was a salary freeze in place at Mentor Graphics. *Id* at 92-93.

On February 19, 2003, Freed presented Thomson with a favorable performance evaluation. Plaintiff's Ex 38. Because the performance evaluation did not address Thomson's longstanding request that she be given a Director's title and an increased pay grade, Thomson wrote a memorandum asking Freed to address the issue, which she discussed with Freed on February 20, 2003. Thomson Depo Ex 4.

Some time prior to April 4, 2003, Freed asked Thomson to give him the names of individuals he could contact to solicit input concerning Thomson's next focal review. Thomson Depo Ex. 5. In her April 7, 2003 response, Thomson suggested that Freed contact Tony Adrian ("Adrian") (Vice President, Corporate Controller – Head of Finance and Worldwide Operations), Don Maulsby ("Maulsby") (Senior Vice President of MGC's World Trade Organization), Don Cantow ("Cantow") (Vice President of Global Accounts), and three other individuals (Markku Tuomola, John Mallow, and Karen Hansen ("Hansen")). *Id*. Freed then contacted several of those individuals, and received negative feedback concerning Thomson's performance in performing her contract management functions. Freed Depo, pp. 219-21; Adrian Depo, pp. 28-29, 33, 38; Cantow Depo, pp. 19-28; Maulsby Depo, pp. 4-5, 8.

6 - FINDINGS AND RECOMMENDATION

Also in April 2003, Yvonne Lawson ("Lawson"), Associate General Counsel under Freed's supervision, told Freed that she was going to quit.  Lawson Depo, p. 42.  Freed then contacted Kelly Forseth ("Forseth"), an outside organizational consultant with whom Freed had worked with previously, to schedule a meeting with Forseth and Lawson to plan for Lawson's departure.  Freed Depo, pp. 72-73.

Freed met with Forseth and Lawson on May 8, 2003, to discuss ideas on how to plan for Lawson's departure.  At the very end of that meeting, Freed and Lawson were discussing possible ideas regarding restructuring, and Freed mentioned the negative feedback he had received regarding Thomson's performance.  Forseth Depo, pp. 45-46.  They then agreed that the meeting could go no further without Thomson involved.  Shortly thereafter, Freed discussed his reorganization plan with Mentor Graphics' President, Greg Hinckley ("Hinckley") (Freed Depo, pp. 236-37), at which time Thomson contends that Freed criticized her performance.

On May 15, 2003, Freed announced to Thomson that he was cutting her hours nearly in half.  He also prepared paperwork to rehire a former Mentor Graphics employee, Mary Del Balzo ("Del Balzo"), as Senior Counsel and Manager of the Worldwide Contracts.  Plaintiff's Ex 51.

Thomson took a medical leave of absence for stress on May 15, 2003, and resigned on July 7, 2003.

## II. **Age Discrimination**

Thomson's First Claim alleges that Mentor Graphics discriminated against her in violation of the Age Discrimination in Employment Act, 29 USC § 621 *et seq*. ("ADEA") and

ORS 659A.030(1)(a) & (b) by constructively discharging her and replacing her with a woman 11

years younger than Thomson.

///

///

///

A.  **Legal Standard**

    1.  **Order of Proof**

The ADEA makes it unlawful for an employer to hire or discharge any individual or

otherwise discriminate against any individual with respect to compensation, terms, conditions, or

privileges of employment, because of the individual's age.  29 USC § 623(a)(1).  Protection

under the ADEA extends to all individuals who are at least 40 years old.  29 USC § 631(a).

Oregon law also prohibits age discrimination, but extends protection to individuals over the age

of 18.  ORS 659A.030(1)(a) & (b).

The Ninth Circuit analyzes ADEA cases using the framework articulated in *McDonnell*

*Douglas Corp. v. Green*, 411 US 792 (1973).  *See Reeves v. Sanderson Plumbing Prods, Inc.*,

530 US 133, 141-42 (2000) (collecting cases from other circuits); *Nidds v. Schindler Elevator*

*Corp.*, 113 F3d 912, 917 (9th Cir 1996), *cert denied*, 522 US 950 (1997).  Under the three-part

methodology articulated in *McDonnell Douglas*, the plaintiff must first establish a *prima facie*

case of discrimination.  The burden of production then shifts to the defendant to articulate a

legitimate, nondiscriminatory reason for the adverse employment action.  The plaintiff is then

afforded an opportunity to demonstrate that the employer's proffered reason was pretextual,

8 - FINDINGS AND RECOMMENDATION

"either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 US 248, 256 (1981).

Although Oregon courts analyzing claims under ORS Chapter 659 have rejected the *McDonnell Douglas* burden-shifting approach, *Callan v. Confederation of Oregon Sch. Adm.*, 79 Or App 73, 717 P2d 1252 (1986), that approach nonetheless applies to the assessment of Oregon employment discrimination claims brought in federal court. *Snead v. Metropolitan Prop. & Cas. Ins. Co*, 237 F3d 1080 (9th Cir), *cert denied*, 534 US 888 (2001); *Williams v. Federal Express Corp.*, 211 FSupp2d 1257, 1261 (D Or 2002).

## 2. *Prima Facie* Case

The requisite degree of proof necessary to establish a *prima facie* case of discrimination on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F3d 885, 889 (9th Cir 1994). The "burden of establishing a *prima facie* case is not designed to be 'onerous' and only requires the production of evidence which 'suggests' that the employment decision was based on age." *Rose v. Wells Fargo & Co.*, 902 F2d 1417, 1420 n1 (9th Cir 1990), quoting *Diaz v. American Tel. & Tel.*, 752 F2d 1356, 1361 (9th Cir 1985). Generally, an employment discrimination plaintiff needs to "produce very little evidence in order to overcome an employer's motion for summary judgment. This is because 'the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by a factfinder, upon a full record.'" *Chuang v. University of Calif. Davis*, 225 F3d 1115, 1124 (9th Cir 2000), quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F3d 1406, 1410 (9th Cir), *cert denied*, 519 US 927 (1996). Oregon's standard for

establishing a *prima facie* case of discrimination is identical to that under federal law.

*Henderson v. Jantzen, Inc.*, 79 Or App 654, 657, 719 P2d 1322, 1324, *rev denied*, 302 Or 35,

726 P2d 934 (1986).

Numerous cases require a plaintiff to establish a *prima facie* case of disparate treatment

discrimination by showing that he or she: (1) belonged to a protected class; (2) was satisfactorily

performing his or her job or was qualified for hire; (3) was terminated, rejected for employment,

or otherwise subjected to an adverse employment action; and (4) the adverse employment action

took place under circumstances giving rise to an inference of unlawful discrimination.  *See, e.g.*,

*O'Connor v. Consolidated Coin Caterers Corp.*, 517 US 308, 312-13 (1996); *McDonnell*

*Douglas*, 411 US at 802; *Chuang*, 225 F3d at 1123; *Nidds*, 113 F3d at 917; *Washington v.*

*Garrett*, 10 F3d 1421, 1433-34 (9th Cir 1994).

### B.  Whether Mentor Graphics Violated the ADEA or ORS Chapter 659A

Because Thomson was at least 40 years old at all relevant times, she belonged to the

protected class under both the ADEA and Oregon law.  With respect to the second element of the

*prima facie* case, Mentor Graphics has submitted testimony from its managers that they gave

Freed negative feedback about Thomson's performance sometime between April 7, 2003 (the

day Freed received Thomson's email identifying persons he should contact to collect information

for her focal review, Thomson Depo Ex 5), and May 8, 2003 (the day of Freed's meeting with

Lawson and Forseth).  However, Thomson uniformly received favorable performance

evaluations during her 19 years of employment with Mentor Graphics and no documentary

evidence refutes those evaluations.  Moreover, Thomson disputes the criticisms of her

performance, and even Mentor Graphics (at the same time it adduces evidence of Thomson's

poor performance) contends that no one at Mentor Graphics wanted plaintiff to quit.[5]

Additionally, the Ninth Circuit has cautioned that evidence such as that submitted by Mentor

Graphics, consisting of subjective evaluations of an employee's performance, is best considered

outside the context of the *prima facie* case:

> In our view, objective job qualifications are best treated at step one
> and subjective criteria, along with any supporting evidence, are
> best treated at the later stages of the process.  To do otherwise
> would in many instances collapse the three step analysis into a
> single step at which all issues would be resolved.  This would
> defeat the purpose underlying the *McDonnell Douglas* process.  In
> addition, addressing the [subjective criteria] at the first step of the
> analysis would increase the possibility that courts will be required
> to engage in evaluations of the performance of [employees], a task
> to which others are better suited.

*Lynn v. Regents of Univ. of California*, 656 F2d 1337, 1344-45 (9th Cir 1981), *cert denied*, 459

US 823 (1982) (citation and footnote omitted).  With respect to those objective qualifications,

Thomson clearly meets the second element of her *prima facie* case.

With respect to the third element of a *prima facie* case, Mentor Graphics argues that

Thomson cannot show that she suffered an adverse employment action because she has no proof

that the reduction in hours was ever implemented.  However, Thomson disputes that Freed

simply suggested the reduced hours as a "proposal" to reduce her workload.  The personnel

requisition prepared on May 15, 2003, to hire Del Balzo (Plaintiff's Ex 51) supports the

conclusion that by the time Freed approached Thomson on May 15, 2003, he had already

decided to reduce her hours nearly in half and hire Del Balzo.  This reduction in hours

---

[5]  At Thomson's request, this statement was stricken from paragraph 22 of Mentor Graphics' fact statement.  However, it supports Thomson's contention that Mentor Graphics valued her contributions and that any criticisms were not ones justifying adverse action against Thomson.

unquestionably qualifies as an "adverse employment action."  *Ray v. Henderson*, 217 F3d 1234, 1243-44 (9th Cir 2000).

This leaves only the fourth element of Thomson's *prima facie* case, namely that the adverse action was taken under circumstances giving rise to an inference of unlawful discrimination.  A searching review of the record reveals no evidence to support such an inference, and as a result, Thomson is unable to establish a *prima facie* case of unlawful age discrimination.

Thomson worked for 19 years for Mentor Graphics and during over 13 of those years, she was supervised by Freed.  Freed promoted her three times during that time period (1993, 1997, and 1999), and each of those promotions occurred when Thomson was more than 40 years old.  Freed also consistently gave her favorable performance reviews and reassigned her the contract management functions in the wake of Tryon's departure.  This favorable treatment of Thomson, all of which took place when Thomson was more than 40 years old, creates a "strong inference" that Freed's later decision to cut back her hours was not motivated by unlawful discrimination.  *See*, *e.g.*, *Coleman v. Quaker Oats Co.*, 232 F3d 1271, 1286 (9th Cir 2000), *cert denied*, 533 US 950 (2001);  *Bradley v. Harcourt, Brace and Co.*, 104 F3d 267, 270-71 (9th Cir 1996); *Buhrmaster v. Overnite Transp. Co.*, 61 F3d 461, 464 (6th Cir 1995), *cert denied*, 516 US 1078 (1996) ("An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class").

The record contains no evidence of any ageist remarks or jokes.  Nor does Thomson's testimony indicate that her complaints about Freed during an off-campus meeting with Hansen and Lawson suggested that she was experiencing age-based bias.  Instead, she complained

generally about her frustrations with some of Freed's decisions and over her feeling that he was not supporting her.  Thomson Depo, pp. 151-53.

"Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome."  *Hazen Paper Co. v. Biggins*, 507 US 604, 610 (1993).  A review of the record reveals that Thomson relies almost exclusively on the fact that she was replaced by Del Balzo, whom Thomson contends was less qualified but was paid more, to support an inference of discrimination.  While Del Balzo was admittedly 11 years Thomson's junior, nothing in the record, other than the fact of this age difference, supports any inference of age discrimination.  This fact, standing alone, is insufficient to rebut the "strong inference" created by 13 years of favorable treatment of Thomson by Freed, up to and including his effort to provide her with management experience by assigning the contracts management functions to her when Tryon left.

Nothing in the record suggests that the May 15, 2003 meeting with Forseth and Lawson organized by Freed had any purpose other than to plan for Lawson's departure.  Lawson notified Freed of her intent to quit sometime in April 2003 (Lawson Depo, pp. 41-43), and Freed set up the meeting with Forseth shortly thereafter.  He also re-contacted Del Balzo, with whom he previously had contact just prior to Thomson's February 20, 2003 request, that he address the issue of her title and pay grade, and notified Del Balzo of a "Potential Position," reassuring her that it would not ruin her friendship with Lawson if Del Balzo were to secure a job at Mentor

Graphics as a result of Lawson's departure.  Plaintiff's Exs 40 & 44.[6]  Prior to that meeting,

Thomson met with Lawson and Hansen off-campus and mentioned that she wanted to reduce her

workload.  When Lawson then met with Freed and Forseth, she told Freed that Thomson wanted

to work fewer hours.  Lawson Depo, pp. 58-60.  By this time, Freed had already received

negative feedback concerning Thomson's performance in her contract management functions.

Based on Lawson's representation that Thomson wanted to work fewer hours, and the negative

feedback he had received concerning Thomson's performance on contract management

functions, Freed decided to reduce Thomson to a 0.5 FTE, in part by removing the contract

management functions he had assigned to her two years prior.

What is abundantly clear from this evidence is that Freed anticipated hiring Del Balzo *but
also* retaining Thomson.  Nothing suggests that Freed's decision to reduce Thomson's hours had

anything to do with her age.  Instead, all evidence indicates that it was the natural solution to

what he believed to be her desire to work fewer hours and his dilemma over what to do about the

concerns expressed by those individuals from whom he had received negative feedback about

Thomson's performance in the contract management area.

The only other fact cited by Thomson as evidence of age bias is that only a month before

Thomson had her hours reduced, Mentor Graphics involuntarily reduced in force ("RIF") the

other oldest member of the Legal Department, Glen Driveness.  Plaintiff's Exhibit 42.  However,

that decision was made by Lawson, not Freed, and nothing else in the record supports the

conclusion that the decision was driven by age-animus.

---

[6]  Although Thomson contends that Freed contacted Del Balzo after her February 20, 2003 request, in fact Freed had
been in contact with Del Balzo previously, and on February 18, 2003, had already set up a lunch meeting with her.  Plaintiff's Ex
40.

14 - FINDINGS AND RECOMMENDATION

Based on the above, Thomson is unable to demonstrate a *prima facie* case of age discrimination regarding Mentor Graphics' decision to cut her hours in half.  Accordingly, Mentor Graphics should be granted summary judgment against Thomson's First Claim.

## III.  Equal Pay

Thomson's Second Claim alleges a violation of both the EPA and its Oregon counterpart, ORS Chapter 652.  Thomson alleges that in April 2001, she took over the management of Mentor Graphics' Worldwide Contracts Group.  Second Amended Complaint, ¶ 11.  The gist of Thomson's Second Claim is that she was paid less than Tryon, who previously served as the Director of Worldwide Contracts at Mentor Graphics.

### A.  Legal Standard

The Equal Pay Act provides as follows:

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

29 USC § 206(d)(1).

"The Equal Pay Act creates a type of strict liability; no intent to discriminate need be shown."  *Maxwell v. City of Tucson,* 803 F2d 444, 446 (9th Cir 1986) (internal quotation and citation omitted).  To establish a claim under the Act, the "plaintiff has the burden of establishing a *prima facie* case of discrimination by showing that employees of the opposite sex were paid different wages for equal work."  *Stanley v. Univ. of Southern Cal.,* 178 F3d 1069, 1073-74 (9th Cir), *cert denied,* 528 US 1022 (1999).

15 - FINDINGS AND RECOMMENDATION

The plaintiff bears the burden of showing the jobs being compared are "substantially equal;" the jobs, however, need not be identical.  *Id* at 1074 (internal citations omitted).  The Ninth Circuit applies a two-step analysis for determining substantial equality:  The court must examine whether the jobs to be compared have a common core of tasks and then determine whether any additional tasks incumbent on one job but not on the other make the two jobs substantially different.  *Id.*  Minor differences in responsibility do not make the equal pay standard inapplicable.  *EEOC v. Maricopa County Cmty. Coll. Dist.*, 736 F2d 510, 514 (9th Cir 1984).

If the plaintiff establishes a *prima facie* case, the burden of persuasion shifts to the defendant to prove by a preponderance of the evidence that the disparity in pay is justified under one of the EPA's four affirmative defenses.  *Hein v. Oregon Coll. of Educ.,* 718 F2d 910, 913 (9th Cir 1983).  A pay disparity is justified only if it is made pursuant to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  29 USC § 206(d)(1).

Oregon's Equal Pay Act similarly provides that:

> No employer shall:
> (a) In any manner discriminate between the sexes in the payment of wages for work of comparable character, the performance of which requires comparable skills.
> (b) Pay wages to any employee at a rate less than that at which the employer pays wages to employees of the opposite sex for work of comparable character, the performance of which requires comparable skills.

ORS 652.220(1).

Oregon courts have not established clear standards for recovery under that statute, but have noted that the Oregon legislation is more inclusive in comparison to the federal legislation:

> The effects of the state and federal equal pay acts are substantially the same.  Both prohibit the payment of different wages to members of the opposite sexes for the performance of comparable or equal work, unless the differential is based on one of several enumerated nondiscriminatory factors.  One difference between them is the fact that the federal act refers to "equal" work, whereas the state act refers to "comparable" work, which is a more inclusive term.

*Smith v. Bull Run Sch. Dist. No. 45*, 80 Or App 226, 229, 722 P2d 27, 29, *review denied*, 302 Or 86, 726 P2d 1185 (1986) (footnote omitted).

In order to be "comparable," the work in question must have "important common characteristics."  *Bureau of Labor and Indus. v. City of Roseburg*, 75 Or App 306, 309 n 2, 706 P2d 956, 959 n 2 (1985), *review denied*, 300 Or 545, 706 P2d 956 (1986).

**B.  <u>Analysis</u>**

Mentor Graphics contends that Thomson's equal pay claims fail because: (1) Thomson cannot show that she was paid a substantially different wage than Tyron; (2) Thomson and Tyron never had the same job or the same duties; and (3) Tyron's experience and qualifications justified any pay difference.  This court need not address the first and last of these arguments because Thomson's equal pay claims fail under both federal and Oregon law for the second reason.  A searching review of the record reveals that the job she performed between April 2001 and May 15, 2003, as Senior Counsel and Worldwide Contracts Manager was not "equal" or "comparable" to the job of Director of  Worldwide Contracts, the position vacated by Tryon.

The difficulty with Thomson's equal pay claims is that a significant portion of job functions performed by Tryon as the Director of Worldwide Contracts was never performed by Thomson, despite her belief to the contrary. Thomson retained her position as Senior Counsel and assumed the "contract management" functions previously performed by Tryon, as well as the title of "Worldwide Contracts Manager," but did not assume a substantial number of other duties, amounting to about one-half of Tryon's job functions. Instead, those other job functions were assumed by other employees, including Freed and O'Donnell. The contract management workload fluctuates, with its greatest demand at the end of each quarter. However, nothing in the record refutes the testimony that Tryon, in his role as Director of Worldwide Contracts, spent about half of his time (a lower percentage close to the end of the quarter) performing functions that were not contract management functions and that were never assumed by Thomson.

It is "the overall job, not its individual segments, that must form the basis of comparison." *Gunther v. Washington Cty.*, 623 F2d 1303, 1309 (9th Cir 1979), *aff'd*, 452 US 161 (1981), citing *Usery v. Richman*, 558 F2d 1318, 1320 (8th Cir 1977). As a result, no equal pay act claim lies where the two jobs in question have a significant difference in duties. *Id* (finding jobs of female prison matrons and male prison guards "qualitatively different" and "not substantially equal" due to disparity in amount of clerical work and prisoner/guard ratios); *Nulf v. Int'l Paper Co.*, 656 F2d 553, 560-61 (10th Cir 1981) (noting that "when significant amounts of time are spent on different tasks, equal work is not involved"); *E.E.O.C. v. Kenosha Unified Sch. Dist. No. 1*, 620 F2d 1220, 1225 (7th Cir 1980) ("an important differentiating task that accounts for a substantial amount of time on the job is sufficient to vitiate an assertion of

equality"); *Marshall v. Building Maintenance Corp.*, 587 F2d 567, 570 (2nd Cir 1978) (comparing jobs of heavy and light duty cleaners).

Thomson's EPA claims fail due to the simple fact that Tryon spent significant amounts of his time performing work tasks than were never assumed by Thomson.  As a result, this court concludes that Tryon's job as Director of Worldwide Contracts and the Thomson's job from April 2001 until May 15, 2003 as Senior Counsel and Worldwide Contracts Manager were neither "equal" (for purposes of federal law) nor "comparable" (for purposes of Oregon law). Accordingly, Mentor Graphics should be granted summary judgment against Thomson's Second Claim.


## IV.  **Wrongful Discharge**

Thomson's Third Claim for wrongful discharge is grounded in the allegation that Mentor Graphics discharged her in retaliation for her complaints about her pay.  Specifically, Thomson contends that she was never given the same title and pay grade as Tryon, that she discussed this with Freed several times, and that Freed assured her he would "take care of it," but that instead, she was wrongfully constructively discharged by Mentor Graphics in retaliation for her February 20, 2003 complaint to Freed about his continuing failure to give her a Director's title and increase in pay grade. *See*, Plaintiff's Exs 38-39.

### A.  **Legal Standard**

In Oregon, the tort of wrongful termination serves as a narrow exception to the at-will employment doctrine in limited circumstances where the courts have determined that the reasons for the discharge are so contrary to public policy that a remedy is necessary in order to deter such

conduct. *Walsh v. Consolidated Freightways, Inc.*, 278 Or 347, 351-52, 563 P2d 1205, 1208 (1977); *Sheets v. Knight*, 308 Or 220, 230-31, 779 P2d 1000, 1006-07 (1989). Oregon courts recognize two circumstances that implicate this tort: (1) discharge for fulfilling a societal obligation or public duty; and (2) discharge for exercising a job-related right of important public interest. *Delaney v. Taco Time Int'l, Inc.*, 297 Or 10, 15-16, 681 P2d 114, 117-18 (1984). Examples of the former include discharge for serving on jury duty, *Nees v. Hocks*, 272 Or 210, 536 P2d 512 (1975), and discharge for refusing to defame a co-worker by signing a false report regarding a co-worker's work-related conduct, *Delaney*, 297 Or at 16, 681 P2d at 118. Examples of the latter include discharge for resisting sexual harassment, *Holien v. Sears, Roebuck & Co.*, 298 Or 76, 689 P2d 1292 (1984), and discharge for filing a workers' compensation claim, *Brown v. Transcom Lines*, 284 Or 597, 588 P2d 1087 (1978).

However, a person cannot state a claim for wrongful termination if: (1) the right being enforced is private and the plaintiff is not suing in her status as an employee; (2) the plaintiff simply alleges that she was discharged in violation of a right, not because she pursued the right; (3) an existing remedy adequately protects the public interest in question; or (4) the legislature has intentionally abrogated the common law remedies by establishing an exclusive remedy. *Delaney*, 297 Or at 16, 681 P2d at 118; *Cross v. Eastlund*, 103 Or App 138, 141, 796 P2d 1214, 1216 (1990).

When, as here, the plaintiff alleges a wrongful *constructive* discharge, he or she must show that: (1) the employer intentionally created or intentionally maintained specified working conditions; (2) the working conditions were so intolerable that a reasonable person in the plaintiff's position would have resigned because of them; (3) the employer desired to cause the

plaintiff to leave employment because of the conditions or knew that the plaintiff was certain, or substantially certain, to leave employment as a result of those conditions; and (4) plaintiff left the employment as a result of those working conditions. *Doe v. Denny's Inc.*, 327 Or 354, 359, 963 P3d 650, 654 (1998).

    **B.  Analysis**

    Assuming that she can prove all the elements of a "constructive" discharge, Thomson also must show that her discharge was "wrongful" in order to proceed on this claim.  In order to do so, she must show that she was constructively discharged either for fulfilling a societal obligation or public duty, or for exercising a job-related right of important public interest.  She does not allege the former, and has failed to show the latter.

    The record reveals that Thomson's complaints to Freed, including her February 20, 2003 complaint which she contends sparked an effort to oust her, were not made in pursuit of any important societal interest.  Instead, Thomson simply complained about her title and pay grade in an effort to earn a higher salary and garner the respect of Mentor Graphics' executives, her peers, and her direct reports.  She made no explicit complaint about age discrimination and, as an employment lawyer, Thomson knew how to put Mentor Graphics on notice of allegedly illegal discrimination had she intended to do so.  Nothing in the record indicates that Thomson was discharged for exercising an employment-related right of public importance.  *See Lambert v. Genesee Hosp.*, 10 F3d 46, 55 (2nd Cir 1993), *cert denied*, 511 US 1052 (1994) (complaint about pay made "without stating that sex was the reason for the disparity" was not protected).  As a result, Thomson is unable to establish that she engaged in any conduct that qualifies as activity

protected by the exceptions to Oregon's general rule of at-will employment.  Accordingly,

summary judgment should be granted in favor of Mentor Graphics on Thomson's Third Claim.

**V.  <u>Defamation</u>**

Thomson's Fourth Claim for defamation alleges that Freed made or published false

statements to Hinkley (President of Mentor Graphics and Freed's direct supervisor), Linda

Christenson (internal organization development manager), Lawson (Associate General Counsel),

Adrian, Cantow, Maulsby, and Forseth (outside organizational consultants) about Thomson's

alleged poor performance as Worldwide Contracts Manager.  Second Amended Complaint,

¶¶ 18-19, 39.

**A.  <u>Legal Standard</u>**

Liability in a defamation case is premised on an unprivileged publication to a third party

of false information that damages the plaintiff's reputation.  *Wallulis v. Dymowski*, 323 Or 337,

345-46, 918 P2d 755, 759-60 (1996).  In Oregon, a statement is conditionally privileged if:  (1) it

was made to protect the interests of defendants; (2) it was made to protect the interests of

plaintiff's employer; or (3) it was made on a subject of mutual concern to defendant and the

person to whom the statement was made.  *Wattenburg v. United Med. Labs.*, 269 Or 377, 380,

525 P2d 113, 114 (1974).  A qualified privilege also attaches to statements made by a company

representative to other employees of the company who share business interests in the company.

*Lund v. Arbonne Int'l, Inc.*, 132 Or App 87, 95-96, 887 P2d 817, 823 (1994).

To maintain a defamation action based on a statement subject to a qualified privilege,

plaintiff must provide proof that the defendant abused the privileged occasion.  *Bank of Oregon*

*v. Indep. News*, 298 Or 434, 437-38, 693 P2d 35, 38-39, *cert denied*, 474 US 826 (1985).  The

privilege may be lost if the speaker does not believe that the statement is true or lacks reasonable grounds to believe that it is true; if it is published for a purpose other than that for which the particular privilege is given; if the publication is made to some person not reasonably believed to be necessary to accomplish the purpose; or if the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose. *Lund*, 132 Or App at 95, 887 P2d at 823.

///

///

///

### B. Analysis

Nothing in the record supports the conclusion that Freed *made* statements to Adrian, Cantow, or Maulsby as alleged by Thomson. Instead, Freed was *soliciting* statements from them in an effort to prepare for Thomson's focal review. Thus, no evidence supports Thomson's claim that Freed defamed her to those individuals.

With respect to Forseth and Lawson, the record is abundantly clear that Freed contacted Forseth, an outside organizational consultant, to meet with him in an effort to plan for Lawson's imminent departure. According to Forseth, Freed and Lawson were discussing the need to reorganize to plan for Lawson's departure and "bounced things back and forth off of each other as two managers would." Forseth Depo, p. 47. In that context, Freed mentioned the feedback he had received concerning Thomson's performance and Lawson mentioned that Thomson wanted to cut back her hours. Those statements, including those by Freed regarding negative input he

had recently received concerning Thomson's performance, were clearly relevant to a subject of mutual concern to Forseth, Lawson, and Freed, namely whether reorganization was needed and how it could best be accomplished given the departmental needs and the relative strengths, weaknesses, and preferences of available personnel. As a result, Freed's statements to Forseth and Lawson enjoy a qualified privilege. Because Thomson has failed to show that Freed abused that privilege, no action for defamation based on those statements is available.

Freed's statements to Hinckley similarly will not support a defamation claim. Thomson contends that Freed told Hinckley that she was not handling the contract management functions correctly and that he was going to take those functions away from her. Thomson Depo, p. 111. Just as Freed's statements during the meeting with Forseth and Lawson enjoy a qualified privilege, so do his later statements to Hinckley about the reasons he had decided to remove the contract management functions from Thomson. Thomson has failed to show that Freed abused the privilege. Instead, the record indicates that Freed had been given unfavorable information about Thomson's performance in the contract management role and was attempting to respond to that information and the information that Lawson would be leaving Mentor Graphics.

This leaves only Thomson's assertion that Freed republished false statements about her performance to Christianson. Thomson has submitted no evidence to support the conclusion that Freed made any statements to Christianson about her performance, only her belief that he did so. Thomson Dec, ¶ 29. Moreover, given Christianson's title ("internal organization development manager," Thomson Dec, ¶ 29) it is likely that those statements are also privileged. Accordingly, the defamation claim based on those alleged statements fails either for lack of proof, or for failure to show that Freed abused the qualified privilege those statements enjoy.

For the above reasons, Mentor Graphics should also be granted summary judgment against Thomson's Fourth Claim.

///

///

///

///

///

///

///

///

## RECOMMENDATION

For the reasons stated above, Mentor Graphics' Motion for Summary Judgment (docket #43) should be GRANTED.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due **December 3, 2004**.  If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 12th day of November, 2004.

25 - FINDINGS AND RECOMMENDATION

_____
Janice M. Stewart
United States Magistrate Judge